STATE of Wisconsin, Plaintiff-Respondent,

v.

Garren G. GRIBBLE, Defendant-Appellant.†

Court of Appeals

*No. 00–1821–CR. Oral argument July 26, 2001.—Decided September 27, 2001.*

## 2001 WI App 227

(Also reported in 636 N.W.2d 488.)

† Petition to review denied 12-17-01.

413

414

415

420

421

On behalf of the defendant-appellant, the cause was submitted on the briefs of and oral argument by *Charles Bennett Vetzner*, assistant state public defender of Madison.

On behalf of the plaintiff-respondent, the cause was submitted on the briefs of *James E. Doyle*, attorney general, and *Sandra L. Nowack*, asst. attorney general. There was oral argument by *Sandra L. Nowack*.

Before Vergeront, P.J., Deininger and Lundsten, JJ.

¶ 1. VERGERONT, P.J. Garren G. Gribble appeals a judgment of conviction of first-degree reckless

homicide in violation of WIS. STAT. § 940.02(1) (1997–98), and an order denying his motion for post-conviction relief. The charges arose out of the death of an infant. Gribble contends that the trial court erred by: (1) questioning jurors outside the presence of Gribble and his attorney; (2) excluding testimony of a defense witness as a sanction for noncompliance with a discovery order entered under WIS. STAT. § 971.23(2m) (1999–2000);[1] (3) admitting other acts evidence; (4) allowing the State to present demonstrative evidence; (5) considering Gribble's defense as a factor in sentencing; and (6) including the counseling expenses of the infant's mother and aunt in the amount of restitution.

¶ 2. We conclude: (1) neither Gribble's constitutional nor statutory rights were violated by the trial court's questioning prospective jurors, outside the presence of Gribble, his attorney, and the prosecutor, on hardship and infirmity requests for not serving; (2) Gribble was obligated under WIS. STAT. § 971.23(2m) to disclose relevant written or recorded statements of all witnesses on his witness list, and since he did not do so, the court properly excluded certain testimony; (3) the trial court properly exercised its discretion in admitting other acts evidence; (4) the trial court properly exercised its discretion in allowing the State's demonstrative evidence; (5) the trial court properly considered Gribble's false testimony and its impact on the infant's mother in sentencing; and (6) the counseling expenses of the infant's mother were properly included in the restitution, but not those of the infant's aunt. Accordingly, we affirm on all issues except on the issue of

[1] All references to the Wisconsin Statutes are to the 1999–2000 version unless otherwise noted.

restitution, and as to that we reverse that portion of the judgment ordering restitution for the aunt's counseling costs.

## BACKGROUND

¶ 3. Gribble's conviction for first-degree homicide arose out of the death of Elijah Foley, a twenty-one-month-old child who died on July 26, 1998, as the result of severe head injuries. The injuries were caused by either shaken-baby syndrome or an actual impact to the head, referred to as shaken-impact syndrome. Gribble was staying with Elijah's mother, Rebecca Foley, and he often cared for Elijah and Rebecca's other child.

¶ 4. Gribble's defense at trial was that he did not inflict the fatal injuries on Elijah but Rebecca did. The defense attacked Rebecca's credibility and raised questions about her ability to care for her children. The defense also elicited testimony to demonstrate Rebecca had severe problems with her temper, and had thrown and shaken her children on prior occasions.

¶ 5. At trial Gribble testified about the events that occurred on the day Elijah was injured. He testified that he cared for Elijah and Rebecca's other child while Rebecca worked. When he left to pick Rebecca up from work, he put both children in the car. Rebecca insisted they return to her apartment before visiting Gribble's father. When they got to the apartment, Rebecca took Elijah, who was whimpering or crying at the time, into the apartment. She was inside with Elijah for a few minutes, then came outside and put Elijah back in the car seat. Gribble thought Rebecca was in a bad mood. They started driving toward Gribble's father's house. A few miles outside the city limits, Rebecca told Gribble to pull over because there was something wrong with

Elijah. Gribble drove them to the hospital while Rebecca called for help on a cell phone.

¶ 6. Rebecca's testimony on the events that day conflicted with Gribble's. She testified that when Gribble picked her up from work and she first got into the car, she thought Elijah was sleeping. Gribble told her that they were going to his father's house. When driving out of town toward Gribble's father's house, she noticed Elijah was unresponsive. She tried to wake Elijah. When Elijah did not respond, she called the hospital from a cell phone and instructed Gribble to drive them to the hospital. Rebecca denied going back to her apartment after work.

## DISCUSSION

*Court's Questioning of Jurors*

¶ 7. Gribble contends the trial court violated his constitutional and statutory rights by questioning prospective jurors outside his presence and the presence of his attorney on whether they had reasons of hardship or infirmity for not being able to serve as jurors.

¶ 8. On the morning the trial was to begin, the trial court informed the prosecutor, Gribble, and his attorney that it intended, before the case was called, to finish its process of taking requests from prospective jurors who sought to be excused or deferred because of hardship or infirmity. The court stated that, other than the anticipated length of the trial, it would not get into any specifics of the case or the charges. The court explained that its purpose in completing this process prior to voir dire was to avoid having prospective jurors with hardship or infirmity requests participate in a voir dire process that was expected to take more than two days.

¶ 9. The court asked Gribble's attorney if he had an objection to proceeding in this way, and he said he had none. The court than asked Gribble if it was all right with him, and he said yes. The trial court proceeded to question individual prospective jurors in-chambers outside the presence of Gribble and both attorneys. No verbatim transcript was made of this questioning.[2] After the court completed this process, it called the court into session in the courtroom, with Gribble and the two attorneys present, as well as the prospective jury panel. The clerk administered the oath to the panel, and, after some introductory comments concerning the case, the court began asking the prospective jurors questions about their relationship to the case and the parties.

¶ 10. Gribble brought a postconviction motion for a new trial, claiming his constitutional and statutory rights to be present for jury selection and to be represented by counsel at every critical stage of the proceedings were violated by the court's unrecorded questioning of prospective jurors. The court ruled that Gribble's rights had not been violated because its questioning of the jurors was part of the court's administrative duties under WIS. STAT. § 756.001(5) to administer the jury system in an "efficient, equitable and cost-effective manner," and, in particular, its duty under WIS. STAT. § 756.03[3] to determine if it should excuse or defer

---

[2] The court's minute sheet states: "Judge and clerk talk with individual jurors in chambers re: excuse for length of trial. [Thirty-eight] jurors were excused—[fifty-five] jurors were questioned."

[3] WISCONSIN STAT. § 756.03 provides:

Excuse; deferral. (1) EXCUSE. The court to which a person is summoned for jury service may excuse the person from jury

a person's jury service. The court decided that its questioning of the jurors on hardship and infirmity requests for not serving was not voir dire, which, the court stated, takes place after the case is called and the prospective panel is sworn.

¶ 11. Gribble relies on *State v. Harris*, 229 Wis. 2d 832, 601 N.W.2d 682 (Ct. App. 1999), for his argument that he has a state and federal constitutional right and a state statutory right to be present during the court's questioning of the prospective jurors on hardship and infirmity requests for not serving. We conclude that the facts in *Harris* differ significantly from those in this case and that neither Gribble's constitutional nor statutory rights were violated.

¶ 12. Both the United States and Wisconsin Constitutions grant a criminal defendant the right to be present and to have counsel present during every critical stage of a criminal proceeding, including jury selection. U.S. CONST. Amends. VI and XIV, § 1; WIS. CONST. art. I, § 7; *Gomez v. United States*, 490 U.S. 858,

service if the court determines that the person cannot fulfill the responsibilities of a juror. The court shall not consider any structural limitations of a facility when making that determination.

(2) DEFERRAL. The court to which a person is summoned for jury service may, upon request of that person, defer to a later date set by the court the period in which the person must serve if the court determines that service as a juror would entail undue hardship, extreme inconvenience or serious obstruction or delay in the fair and impartial administration of justice.

(3) CLERK AUTHORIZED TO GRANT. The judge responsible for administering the jury system in the circuit court may authorize the clerk of circuit court to grant excuses or deferrals under this section. The authorization may limit the grounds on which the clerk of circuit court may grant the excuse or deferral and may require persons seeking an excuse or deferral to document the basis for any excuse or delay.

872–73 (1989). In explaining why jury selection is a critical stage of the trial, the Court in *Gomez* used the term "voir dire" interchangeably with "jury selection" and explained: "voir dire represents [the prospective] jurors' first introduction to the substantive factual and legal issues in a case" and the "gestures and attitudes of all participants" must be scrutinized "to ensure the jury's impartiality." *Id.* at 874–75. Voir dire plays a critical function in assuring the criminal defendant that his Sixth Amendment right to an impartial jury will be honored. *Id.* at 873. In addition to these constitutional provisions, WIS. STAT. § 971.04(1) provides that, with certain exceptions not relevant here, the "defendant shall be present . . . [d]uring voir dire of the trial jury."

¶ 13. Whether the trial court's questioning here of the prospective jurors on hardship and infirmity reasons for not serving is a critical stage of the trial under the constitutional standard presents a question of law, which we review de novo. *State v. Andrews*, 201 Wis. 2d 383, 389, 599 N.W.2d 210 (1996). Similarly, whether that questioning is included within the meaning of "voir dire" under WIS. STAT. § 971.04(1) presents a question of law. *See State v. Setagord*, 211 Wis. 2d 397, 405–06, 565 N.W.2d 506 (1997).

¶ 14. In *Harris*, the trial court decided that it would talk to the group of prospective jurors to see if it could "weed out or excuse any of them who have, in . . . [the court's] view, legitimate reasons for not being able to serve on a trial." *Harris*, 229 Wis. 2d at 834. Both attorneys agreed to the court process; however, the defendant was not present at the time the court announced its intention and did not personally consent to it until after the court completed its "weeding out"

process. *Id.* at 835, 837. Outside the presence of the defendant, the trial court in *Harris* proceeded:

> [It] first asked the forty potential jurors if any of them had heard or read about the case. . . . The trial court then explained to the venire panel the obligation of every juror to be fair and impartial, informed them that the State had the burden of proof beyond a reasonable doubt, and asked if there were any who believed that they could not be fair and impartial. . . . The trial court also told the panel that jury service occasionally created scheduling problems for jurors, and asked if anyone wished to be excused because jury service would conflict with their personal or work obligations. . . . The trial court then read to the venire panel a list of potential witnesses. Six persons, including two who had previously indicated that they could not be fair and impartial, indicated that they knew one or more of the potential witnesses.

*Id.* at 835–36.

¶ 15. In *Harris*, we concluded that the trial court had violated Harris's constitutional and statutory rights to be present at jury selection[4] and that the State had not shown this error was harmless. *Id.* at 839, 845. However, in *Harris*, unlike in this case, the court questioned the prospective jurors on matters relating to their ability to be fair and impartial and that fact was critical to our analysis. These are matters that the trial court is required to inquire into by Wis. Stat. § 805.08(1) and they go to the heart of voir dire.[5]

---

[4] *Harris* was decided under a prior version of Wis. Stat. § 971.04(1)(c) (1995–96) which provided that the defendant shall be present "[a]t all proceedings when the jury is being selected" instead of "[d]uring voir dire of the trial jury."

[5] Wisconsin Stat. § 805.08(1) provides:

¶ 16. In this case the trial court was exercising its discretion under Wis. Stat. § 756.03(1)-(2) to excuse individuals not able to fulfill their responsibilities as jurors and to defer service due to undue hardship. This type of questioning by the court does not implicate the purposes of voir dire that are the premise for a defendant's constitutional entitlement to be present with counsel. It is not the prospective jurors' "first introduction to the substantive factual and legal issues in a case." *Gomez*, 490 U.S. at 874. And, since the questions are not directed at eliciting information on prospective jurors' backgrounds, or any other information that might reveal bias, there is no need for the defendant and counsel to be present in order to scrutinize gestures and attitudes to ensure impartiality. *See id.* at 874–75. We therefore conclude that Gribble did not have a federal or state constitutional right to be present with counsel when the court questioned the

QUALIFICATIONS, EXAMINATION. The court shall examine on oath each person who is called as a juror to discover whether the juror is related by blood, marriage or adoption to any party or to any attorney appearing in the case, or has any financial interest in the case, or has expressed or formed any opinion, or is aware of any bias or prejudice in the case. If a juror is not indifferent in the case, the juror shall be excused. Any party objecting for cause to a juror may introduce evidence in support of the objection. This section shall not be construed as abridging in any manner the right of either party to supplement the court's examination of any person as to qualifications, but such examination shall not be repetitious or based upon hypothetical questions.

In addition, Wis. Stat. § 972.02 provides in part:

**Jury trial; waiver. (1)** Except as otherwise provided in this chapter, criminal cases shall be tried by a jury selected as prescribed in s. 805.08, unless the defendant waives a jury in writing or by statement in open court or under s. 967.08(2)(b), on the record, with the approval of the court and the consent of the state.

prospective jurors to determine whether to excuse or defer service of any under § 756.03.

¶ 17. Turning to the statutory issue, we bear in mind that in construing a statute our aim is to carry out the legislature's intent, and to that end we look first to the language of the statute, WIS. STAT. § 971.04(1)(c), to determine whether that language plainly sets forth the legislature's intent. *Setagord*, 211 Wis. 2d at 405–06. When statutes relate to the same subject matter, ·we consider them together and attempt to harmonize them. *City of Milwaukee v. Milwaukee County*, 27 Wis. 2d 53, 56, 133 N.W.2d 393 (1965). Therefore, in determining whether the legislature intended that the court's questioning on excuses or deferral of service due to hardship or infirmity comes within § 971.04(1)(c), we will also consider WIS. STAT. §§ 805.08(1), 756.001(5) and 756.03.

¶ 18. Reading these statutes together, we conclude that the legislature plainly intended that the court's questioning under WIS. STAT. § 756.03 is not part of "voir dire" within the meaning of WIS. STAT. § 971.04(1)(c). Excusing and deferring prospective jurors under § 756.03 is one component of a circuit judge's obligation to administer the jury system, *see* WIS. STAT. § 756.001(5), and, as with other duties under this chapter, the responsible judge may delegate his or her authority to the clerk of circuit court under § 756.03(3). Thus, these sections plainly contemplate that the process of deciding upon excuses or deferrals under § 756.03(1)-(2) may be handled administratively, need not be handled by a judge, in court, or with the prospective juror present in person, and may take place well in advance of a particular trial. The

431

legislature could not have intended to require the defendant's presence when the judge or clerk is acting in an administrative capacity under § 756.03. In contrast, the procedure by which a court questions jurors to determine bias under WIS. STAT. § 805.08(1) takes place after the jurors are sworn in, with the jurors and parties present, and involves the judge ruling on objections—that is, functioning in a judicial capacity rather than in an administrative capacity. We conclude that the procedure described in § 805.08(1) is the "voir dire of the trial jury" referred to in § 971.04(1)(c).

■

¶ 19. Gribble also contends that the court violated SCR 71.01(2) (2000) because it failed to make a verbatim record of its review of hardship and infirmity requests of prospective jurors. SCR 71.01(2) states that "[a]ll proceedings in the circuit court shall be reported" except settlement, pretrial, and other conferences or matters related to scheduling or, in the case of a criminal complaint, matters preceding the filing of a criminal complaint. However, we have already concluded that the task of excusing or deferring prospective jurors under WIS. STAT. § 756.03 is an administrative function. Gribble asserts the Wisconsin Judicial Benchbook on criminal proceedings suggests that trial judges incorporate inquires under § 756.03 into the jury selection process.[6] However, that is not what happened in this case. We are satisfied that the court's questioning here of the jurors on hardship and infirmity reasons for

---

[6] I WIS. JUDICIAL BENCHBOOK: CRIMINAL & TRAFFIC CR 23–5 (2d ed. 2001) lists as a permitted question by the trial court, "[h]ardship suffered by juror as result of being selected, taking into account anticipated length of trial," along with inquiries related to WIS. STAT. § 805.08(1).

excusing or deferring service was not "a proceeding in the circuit court" within the meaning of SCR 71.01(2) and did not need to be reported.

*Exclusion of Defense Witness's Testimony*

■

¶ 20. Gribble contends the trial court erred in interpreting his obligation under Wis. Stat. § 971.23(2m) to provide the statement of a witness and erred in excluding testimony about that statement as a sanction.[7] Prior to trial, the State made a demand on the defense to disclose a list of all witnesses Gribble intended to call at trial, other than himself, and any relevant written or recorded statements of the witnesses pursuant to § 971.23(2m). In response, Gribble submitted a list of witnesses, then moved the court for an order "clarifying

---

[7] Wisconsin Stat. § 971.23(2m) provides in part:

What a defendant must disclose to the district attorney. Upon demand, the defendant or his or her attorney shall, within a reasonable time before trial, disclose to the district attorney and permit the district attorney to inspect and copy or photograph all of the following materials and information, if it is within the possession, custody or control of the defendant:

(a) A list of all witnesses, other than the defendant, whom the defendant intends to call at trial, together with their addresses. This paragraph does not apply to rebuttal witnesses or those called for impeachment only.

(am) Any relevant written or recorded statements of a witness named on a list under par. (a), including any reports or statements of experts made in connection with the case or, if an expert does not prepare a report or statement, a written summary of the expert's findings or the subject matter of his or her testimony, and including the results of any physical or mental examination, scientific test, experiment or comparison that the defendant intends to offer in evidence at trial. This paragraph does not apply to reports subject to disclosure under s. 972.11 (5).

433

that [he was] not obligated to produce any statements of witnesses who [would] rebut or impeach any of the State's witnesses or evidence." Gribble's position was that "rebuttal and impeachment witnesses" included witnesses that rebutted any contention of the State, and the only witnesses who were not rebuttal or impeachment witnesses were those establishing an affirmative defense such as diminished capacity or alibi. The prosecutor objected to that construction of the statute because the result would be that all of Gribble's witnesses for his defense case-in-chief would come within the exclusion.

¶ 21. In its written decision on the motion, the court rejected Gribble's definition of rebuttal and impeachment witnesses, reasoning that if it meant any evidence that had a tendency to discredit or cast doubt on the State's case, the "exception . . . [would] swallow the rule." The court then set forth in detail its construction of the exception and ordered Gribble to provide any relevant written or recorded statements of witnesses who did not meet the criteria the court described.

¶ 22. Included on Gribble's witness list were the names of Angela Pinkham, a friend of Rebecca, and William G. Garrott, a private investigator retained by Gribble. Garrott had spoken to Pinkham concerning statements Rebecca made about the events of the day Elijah was injured.

¶ 23. As part of his defense that it was Rebecca who inflicted the injuries, Gribble attempted at trial to establish support for his testimony that Rebecca had taken Elijah into the apartment alone after he picked her up from work. On cross-examination, Rebecca denied that she had told Pinkham she went home after work. The defense called Pinkham and asked her whether she had answered "yeah, I do believe so, yeah,"

to Garrott's question whether Rebecca had told her that after Gribble picked her up at work they went to her apartment. Pinkham denied saying that to Garrott.

¶ 24. The defense then called Garrott, who testified that Pinkham told him that Rebecca told her that after work they drove back to her apartment and Pinkham believed Rebecca told her she went into the apartment. When asked why he was certain Pinkham had made such a statement, Garrott stated that he had tape recorded the conversation with Pinkham and had reviewed a copy of the transcript before testifying. The State objected, claiming Gribble had violated the discovery order by not turning over the statement as requested.[8] Defense counsel responded that the discovery order did not apply to impeachment testimony and that Garrott was impeaching Pinkham's testimony.

¶ 25. The trial court referred to its written decision and order and concluded that Garrott's testimony on this point went beyond the definition of impeachment it had set forth there and was substantive evidence. The court then asked defense counsel whether he had good cause for failing to comply with the order by turning over Pinkham's statement made to Garrott, and defense counsel repeated his arguments made before entry of the order—that the Wis. Stat. § 971.23(2m)(a) exception for impeachment witnesses included Garrott's testimony on Pinkham's statement. The court concluded that defense counsel's reason for not complying was that he disagreed with the order, and it decided this reason was not good

---

[8] The State also objected because Garrott made the recording without Pinkham's knowledge, but we need not address that issue on this appeal.

cause. The court therefore struck Garrott's testimony regarding Pinkham's statement and instructed the jury to disregard that testimony.

¶ 26. On appeal Gribble claims that the trial court's interpretation of WIS. STAT. § 971.23(2m) was contrary to the plain language of the statute. In his view the statute unambiguously states that the disclosure requirement of witness statements in para. (am) does not apply "to rebuttal witnesses or those called for impeachment only" and, he asserts, the trial court's interpretation of that exclusion was impermissibly restrictive. The State responds that we need not address the meaning of the exclusion in para. (a) for rebuttal and impeachment witnesses, because para. (am) requires disclosure of any witness statement once the witness is identified on the witness list under para. (a).[9] Thus, according to the State, once Pinkham and Garrott were placed on Gribble's witness list, disclosure of written or recorded statements by them was required.

¶ 27. We agree with the State. The plain language of WIS. STAT. § 971.23(2m)(am) requires that if a witness is named on a list under para. (a), any relevant written or recorded statements of that witness must be disclosed. The qualification that "[t]his paragraph does not apply to rebuttal witnesses or those called for impeachment only" is expressly stated only in para. (a); it is not contained in para. (am). Paragraph (am) refers to "witness[es] named on a list under par. (a)"—plainly including all witnesses actually named on the list. A defendant may choose not to disclose witnesses that will be called only in rebuttal or impeachment, but if

---

[9] The State makes alternative arguments on the construction and application of the statute that we need not address.

the defendant wants the option of calling a witness for other than those purposes, the witness must be on the list under para. (a) and relevant written or recorded statements of that witness must be provided under para. (am).[10]

■

¶ 28. Wisconsin Stat. § 971.23(7m) requires the trial court to exclude evidence that is not produced as required by the statute "unless good cause is shown for failure to comply."[11] Exclusion is not mandatory if the court finds "good cause." *State v. Wild*, 146 Wis. 2d 18, 27, 429 N.W.2d 105 (Ct. App. 1988). Gribble contends that even if he did violate the court's discovery order, he had good cause for doing so, because he was relying in good faith on prior case authority to support his argument that the trial court's interpretation of the statute was erroneous. Gribble's good cause argument is premised on his interpretation of the exclusion for

---

[10] Although this is not the interpretation of the trial court, we may affirm a trial court's ruling on a question of law on a different ground than that relied on by the trial court. *State v. Baudhuin*, 141 Wis. 2d 642, 648, 416 N.W.2d 60 (1987) ("If the [trial court's] holding is correct, it should be sustained, and this court may do so on a theory or on reasoning not presented to the trial court.").

[11] Wisconsin Stat. § 971.23(7m) provides:

(7m) Sanctions for failure to comply. (a) The court shall exclude any witness not listed or evidence not presented for inspection or copying required by this section, unless good cause is shown for failure to comply. The court may in appropriate cases grant the opposing party a recess or a continuance.

(b) In addition to or in lieu of any sanction specified in par. (a), a court may, subject to sub. (3), advise the jury of any failure or refusal to disclose material or information required to be disclosed under sub. (1) or (2m), or of any untimely disclosure of material or information required to be disclosed under sub. (1) or (2m).

rebuttal and impeachment witnesses in WIS. STAT. § 971.23(2m)(a), which the trial court rejected in its order.

¶ 29. A trial court's decision whether to exclude evidence for failure to comply with discovery requirements under WIS. STAT. § 971.23 is committed to the trial court's discretion, and if there is a reasonable basis for the ruling, we do not disturb it. *See State v. Guzman*, 2001 WI App 54, ¶ 19, 241 Wis. 2d 310, 624 N.W.2d 717, *review denied*, 2001 WI 88, 246 Wis. 2d 166, 630 N.W.2d 219.

¶ 30. The record supports the trial court's determination that the reason defense counsel did not produce Pinkham's statement made to Garrott is that he disagreed that the statute required him to do so. Nothing in the record suggests that defense counsel did not understand that the court's order required him to do so. In the typical situation when a party's reason for not complying with a trial court's order on discovery is disagreement on the proper interpretation of the statute, resolution of that issue on appeal effectively resolves the issue of good cause: if we agree with the trial court's interpretation, we generally have no hesitancy in concluding that the party's disagreement with the court's order does not constitute good cause for failing to comply with the order; and if we agree with the party's interpretation, then the trial court erred and "good cause" is not an issue.

¶ 31. In this case, however, we have not adopted the construction of either the trial court or Gribble. However, under our construction of the statute, as

under the trial court's, Gribble was obligated to produce Pinkham's statement made to Garrott under Wis. Stat. § 971.23(2m)(am). Thus, this is not a case where the trial court's erroneous interpretation of the statute resulted in an erroneous order. Because Gribble's only argument on good cause is premised on his construction of the statute, and because we reject his construction as erroneous, it follows that Gribble did not have good cause. It is reasonable for a trial court to expect that a party will comply with its order unless or until the order is vacated, stayed, or reversed, and a party who chooses not to do that because of a disagreement with the order assumes the risk that a reviewing court will not agree with the party's view of the law.

¶ 32. We do not agree with Gribble that the facts in this case are similar to those in *Wild*. In that case the trial court failed to consider whether the district attorney had good cause. We therefore reviewed the record and determined that the district attorney had made a good faith argument that he had tried to obtain the required reports and had made a good faith argument that certain of the tardy reports were not subject to the trial court's order. *Wild*, 146 Wis. 2d at 28. We concluded this was an adequate showing of good cause. *Id.* In this case, there is no question of Gribble's ability to obtain the required statement, and defense counsel did not argue that Pinkham's statement to Garrott was not subject to the court's order; rather, as we have stated above, his argument was that the court's order was based on an incorrect interpretation of the statute.

¶ 33. However, if we assume that the fact that we have adopted a different construction of the statute than did the trial court somehow requires a reversal of its good cause determination, we nevertheless conclude

that Gribble is not entitled to a new trial on this ground. The trial court's decision to exclude evidence is subject to a harmless error analysis. *Martindale v. Ripp*, 2001 WI 113, ¶ 30, 246 Wis. 2d 67, 629 N.W.2d 698. We are satisfied that there is no reasonable possibility that exclusion of Garrott's testimony of Pinkham's statement contributed to the guilty verdict, and our confidence in the verdict is not undermined. As related by Garrott, Pinkham said she believed Rebecca told her that after work Rebecca had gone into her apartment; there was no mention of Elijah being with Rebecca in the apartment then. Evidence of Rebecca going into her apartment is of minimal probative value because, unless Elijah were with her, she had no opportunity to harm him.

■■

¶ 34. Gribble also argues that, even if the court properly decided he did not have good cause under Wis. Stat. § 971.23(7m), subsec. (7m) provides that a court "may in appropriate cases grant the opposing party a recess or a continuance." According to Gribble, the trial court erroneously exercised its discretion in not granting a continuance and instead excluding the evidence. He points out that his attorney suggested a continuance and it was the prosecutor who opposed it and insisted on exclusion. Gribble misreads the statute and *Wild*, which he cites in support of his position. If the party does not show good cause, the court "*shall* exclude any witness not listed or evidence not presented." Section 971.23(7m) (emphasis added). In *Wild*, we determined there was good cause, and that is why we considered whether the trial court had properly denied a continuance. *Wild*, 146 Wis. 2d at 28–29 ("A finding of good cause does not preclude exclusion of the evidence as a sanction; exclusion is just no longer mandatory.").

¶ 35. In summary, since Gribble listed Pinkham on his witness list, he was obligated under Wis. Stat. § 971.23(2m)(am) to provide the prosecutor with a copy of her statement made to Garrott. Since Gribble did not, and since he did not show good cause for not doing so, the trial court did not err in excluding Garrott's testimony on Pinkham's statement.

*Other Acts Evidence*

¶ 36. Gribble contends the trial court erroneously exercised its discretion in admitting evidence of a purported cigarette burn under Elijah's left armpit and three separate incidents involving abuse to another child, Meggie E., which occurred in 1996 while Meggie was in Gribble's care. The evidence concerning these incidents, he contends, does not meet the criteria for admitting other acts evidence under Wis. Stat. § 904.04(2).[12]

¶ 37. The evidence concerning the burn, which the State presented by pretrial motion, was as follows. On July 11, 1998, Rebecca noticed a scabbed burn mark under Elijah's left armpit. Elijah had returned from a visit with his father on July 8, and Rebecca had not noticed any marks on Elijah when she gave him a bath that evening. She had had limited contact with Elijah

---

[12] WISCONSIN STAT. § 904.04(2) provides:

OTHER CRIMES, WRONGS, OR ACTS. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith. This subsection does not exclude the evidence when offered for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

from that evening until she noticed the mark. Gribble asserted that he did not know how Elijah was burned and it probably came from the visit with his father. Later, a daycare worker observed the burn and a social services investigation occurred. The physician assistant who examined the child on July 14, 1998, as part of the investigation, determined that the burn was three-to-seven days old. Whether the burn was the result of a cigar or cigarette was undetermined, although the physician assistant testified that the burn was consistent with a cigarette burn. Both Gribble and Rebecca smoked cigarettes.

¶ 38. The State offered the evidence of the burn mark to show Gribble's motive and intent to harm the victim. Defense counsel objected to the admission of the evidence of the burn, arguing there was insufficient evidence to conclude Gribble caused the burn. The trial court allowed the evidence to be admitted because it determined the burn injury was relevant to motive and intent. The jury was instructed on two separate occasions that it was to consider evidence of the burn mark only for the purpose of showing motive and intent.

¶ 39. A trial court's decision to admit other acts evidence is a discretionary one, and we affirm if the trial court reviewed the relevant facts, applied a proper standard of law, and using a rational process, reached a reasonable conclusion. *State v. Davidson*, 2000 WI 91, ¶ 53, 236 Wis. 2d 537, 613 N.W.2d 606. In deciding whether to admit the evidence, the court is to engage in a three-step inquiry: (1) is the other acts evidence offered for an acceptable purpose under WIS. STAT. § 904.04(2); (2) is the other acts evidence relevant under WIS. STAT. § 904.01; and (3) is the probative value of the other acts evidence substantially outweighed by

the danger of unfair prejudice, confusion, or delay under Wis. Stat. § 904.03? *State v. Sullivan*, 216 Wis. 2d 768, 772–73, 576 N.W.2d 30 (1998).

¶ 40. Gribble contends that evidence of Elijah's burn mark should not have been admitted because the preponderance of the evidence does not establish that Gribble caused the injury.[13] This implicates the second step of the *Sullivan* analysis, because implicit in a decision that evidence of the other act is relevant is a determination that a jury could reasonably find by a preponderance of the evidence that the defendant committed the other act. *State v. Gray*, 225 Wis. 2d 39, 59, 590 N.W.2d 918 (1999). This particular determination presents a question of law, which we review de novo. *Id.* It is not necessary for the prior evidence to be in the form of a conviction, and other acts evidence may consist of uncharged offenses. *Id.*

¶ 41. We conclude there is sufficient evidence for a reasonable jury to find by a preponderance of the evidence that Gribble caused the burn injury to Elijah. The physician assistant determined on July 14 that the burn injury was three-to-seven days old; Rebecca had bathed the child on July 8 and did not notice any mark;

---

[13] Gribble also argues on appeal that the evidence of the burn had no probative value and any probative value was substantially outweighed by the danger of unfair prejudice. However, at the hearing on the State's pretrial motion, Gribble's only objection was that there was not proof by a preponderance of the evidence that he inflicted the mark and he was never charged. After the court rejected this argument, Gribble raised no other objections to this evidence during the trial. We do not address on appeal an objection to evidence not made in the trial court. *See State v. Bustamante*, 201 Wis. 2d 562, 571, 549 N.W.2d 746 (Ct. App. 1996).

and Gribble was primarily responsible for the child between July 8 and July 11, the date the injury was discovered. Gribble smoked cigarettes and testimony supported a finding that the cause of the injury was a cigarette. Finally, it was Gribble who suggested that the injury was a result of Elijah's visit with his father.

¶ 42. We next consider the evidence concerning Meggie, which involved three separate incidents in 1996. Meggie was the daughter of Gribble's girlfriend at the time, Colby E. Meggie was approximately eighteen-months old when the first incident occurred in October 1996. A babysitter told Colby that after Gribble dropped Meggie off, the child slept the entire day. Colby observed red dots in the child's eyes and bruises on her face, and she had a fever. Gribble had previously told Colby that the child fell off a toy horse several days before. Colby took the child to the emergency room. The doctors who examined Meggie felt the injuries were consistent with the explanation that the child had fallen off a toy horse, but one doctor also testified that the injuries could possibly have been caused by child abuse.

¶ 43. Colby again discovered bruises on Meggie's face in November 1996, and two gouges on her stomach on each side of her belly button. Gribble had cared for Meggie the preceding day, and, according to Colby, he told her the bruises were from a fall off a bed and he did not know how the gouges happened. Gribble testified at trial that he caused the injuries to the child's face when he tried to take a crayon out of her mouth. The injuries were documented on a videotape.

¶ 44. The third incident occurred in December of 1996. Colby allowed Gribble to watch Meggie and her other child for one-to-two hours. When Colby returned, Meggie started to cry and then threw up; she appeared to have a large rash on her stomach. Gribble said

Meggie had been playing at a neighbor's house with other children and they were playing with some baby powder. The next day, Meggie complained of abdominal pain and she had bruising on her stomach. Colby took her to the doctor, who observed bruises around the child's belly button that appeared to be the result of pinching the child's skin. The doctor reported the incident as child abuse.

¶ 45. The State offered evidence of these three incidents to prove Gribble's knowledge and absence of mistake or accident. Defense counsel objected because: it amounted to propensity evidence; Gribble was not charged with child abuse for two of the three incidents; the three prior incidents were not similar to the incident causing Elijah's death; Gribble was not claiming Elijah's injuries were an accident; and the evidence would be unfairly prejudicial to Gribble. The trial court allowed the evidence of the three incidents with Meggie to show knowledge and absence of mistake or accident. It instructed the jury on three separate occasions that it was to consider this evidence only on the issues of "knowledge and absence of mistake or accident."

¶ 46. Gribble concedes that the evidence concerning Meggie was offered for acceptable purposes under step one of the *Sullivan* analysis, but argues that the court erred in applying steps two and three because: (1) a jury could not find by a preponderance of the evidence that Gribble caused Meggie's injuries; (2) the evidence was not relevant under Wis. Stat. § 904.01 because Gribble's defense was not that Elijah's injuries were the result of a mistake or accident, and because the Meggie incidents were too dissimilar to be proba-

tive; and (3) any probative value was substantially outweighed by the danger of unfair prejudice to Gribble.

¶ 47. We conclude the evidence of the three incidents was sufficient for a reasonable jury to find by a preponderance of the evidence that Gribble caused Meggie's injuries. Gribble admitted that all the incidents occurred while Meggie was in his care, they each occurred within one month of another, and he had no explanation for some injuries while his explanations for others could be considered either inconsistent or implausible by a reasonable jury.

¶ 48. We also conclude the trial court did not erroneously exercise its discretion in deciding that the evidence concerning Meggie was relevant under Wis. Stat. § 904.01. To meet this standard, other acts evidence must relate to some fact that is of consequence to the determination of the action, and it must have some tendency to make that fact more or less probable than it would be without the evidence. *Sullivan*, 216 Wis. 2d at 772. We decide what facts are of consequence by referring to the elements of the crime the State must prove, and we are not limited to the elements the defendant is challenging in his or her defense. *State v. Veach*, 2001 WI App 143, ¶ 27, 246 Wis. 2d. 395, 630 N.W.2d 256, *review granted*, 2001 WI 114, 246 Wis. 2d 171, 634 N.W.2d 318.

¶ 49. In order to prove Gribble was guilty of first-degree reckless homicide, the State had to prove that Gribble recklessly caused Elijah's death under circumstances that showed an "utter disregard for hu-

man life." WIS. STAT. § 940.02(1) (1997–98).[14] The State must prove that Gribble's conduct "create[d] an unreasonable and substantial risk of death or great bodily harm to [Elijah] . . . [and that Gribble was] aware of that risk." WIS. STAT. § 939.24(1) (1997–98). If the jury believed that Gribble inflicted Meggie's injuries, that is evidence that relates to a fact of consequence— Gribble's awareness of the type of conduct that could cause great bodily harm to an infant.

¶ 50. We do not agree with Gribble that Meggie's injuries are so dissimilar from those causing Elijah's death that a reasonable judge could not decide they are probative of Gribble's awareness of the risk of the conduct that caused Elijah's death.[15] Meggie and Elijah were close in age and Meggie's injuries were serious, prompting her mother to seek medical attention for them on two occasions.

¶ 51. Gribble also contends that because the incidents the defense sought to have admitted regarding other acts of Rebecca Foley in 1996 were considered too remote in time to be admissible, the incidents involving Meggie, which also occurred in 1996, should be consid-

---

[14] WISCONSIN STAT. § 940.02(1) (1997–98) provides:

> Whoever recklessly causes the death of another human being under circumstances which show utter disregard for human life is guilty of a Class B felony.

[15] The prior act need not be identical to the charged offense in order to be probative. *State v. Davidson*, 2000 WI 91, ¶ 72, 236 Wis. 2d 537, 613 N.W.2d 606. The probative value of the other acts evidence depends on the other incidents' nearness in time, place, and circumstances to the alleged crime or to the fact or proposition sought to be proved. *State v. Sullivan*, 216 Wis. 2d 768, 786, 576 N.W.2d 30 (1998). The required degree of similarity between the other act and the charged offense is not formulated as a general rule. *Id.* at 787.

447

ered too remote in time to be admissible. However, each act that is sought to be admitted must be weighed and subjected to the *Sullivan* analysis discussed earlier. Gribble does not argue that the 1996 acts of Rebecca were erroneously excluded. The question, therefore, is whether, given the degree of similarity of the prior incidents with Meggie and the charged incident, an interval of somewhat less than two years causes the prior incidents to lack probative value regarding Gribble's awareness of the risk of his conduct toward Elijah? We are satisfied that a reasonable judge could conclude this time interval did not significantly weaken the probative value.

■

¶ 52. Finally, we conclude that a reasonable judge could decide that the probative value of the evidence concerning Meggie was not substantially outweighed by the danger of unfair prejudice to Gribble. Evidence that is unfairly prejudicial "has a tendency to influence the outcome by improper means or . . . appeals to the jury's sympathies, [to] arouse[] its sense of horror, provoke[] its instinct to punish or otherwise cause[] a jury to base its decision on something other than the established propositions in the case." *Sullivan*, 216 Wis. 2d at 789–90. A proper cautionary instruction limits the danger of unfair prejudice that may result from other acts evidence, *Davidson*, 2000 WI 91 at ¶ 78, and the trial court here gave the limiting instruction concerning Meggie's injuries on three separate occasions. We can see no reason why the jury would be provoked to punish Gribble for Meggie's less serious injuries by convicting him in this case, and his short and conclusory argument on prejudice does not inform us of any reason.

*Use of Demonstrative Evidence*

¶ 53. Gribble contends the trial court erroneously exercised its discretion in permitting Dr. William H. Perloff to demonstrate with a doll the force that caused Elijah's injuries. Before trial, the court viewed the demonstration, heard the voir dire of Dr. Perloff, and considered the parties' arguments. It determined that the demonstration was admissible to prove an element of the crime—an utter disregard for human life—because it would help the jury understand the amount of force needed to inflict the injuries from which Elijah died. The court reasoned that the demonstration was relevant because it was "helpful to the jury to understand that the force necessary to inflict the injuries sustained by [the victim was] distinguished from lesser forces such as bouncing a baby on one's knee or the trauma an infant may experience from falling off a bed or off from someone's lap."

¶ 54. At trial, Dr. Perloff explained the method he used to determine the amount of force he believed was consistent with Elijah's injuries. In addition to explaining his qualifications as a civil engineer and medical doctor, he stated that he was relying upon his studies of other shaken-baby cases and of children who suffered severe head injuries from known causes. Dr. Perloff explained to the jury that the doll was a good simulation of a child somewhat smaller than Elijah[16] and had a neck that rotated similar to that of a baby's neck. Finally, Dr. Perloff explained that the demonstration was not an attempt to show the exact events that occurred when Elijah sustained his injuries; rather it was a demonstration of the type of force and impact

---

[16] Elijah was approximately thirty-two pounds while the doll weighed eighteen pounds.

necessary to cause injuries consistent with Elijah's injuries. Dr. Perloff's demonstration consisted of holding the doll under the arms by the torso and then striking the doll's head against a courtroom wall in one strike.

¶ 55. The decision to admit or exclude demonstrative evidence is committed to the trial court's discretion. *Hernke v. Northern Ins. Co. of N.Y.*, 20 Wis. 2d 352, 359, 122 N.W.2d 395 (1963). As long as the trial court demonstrates a reasonable basis for its determination, this court must defer to the trial court's ruling. *State v. Pharr*, 115 Wis. 2d 334, 342, 340 N.W.2d 498 (1983). In exercising its discretion, the trial court must determine whether the demonstrative evidence is relevant, WIS. STAT. §§ 904.01 and 904.02, and whether its probative value is substantially outweighed by the danger of unfair prejudice. WIS. STAT. § 904.03.[17]

¶ 56. Gribble contends the demonstration was not relevant because the State's medical experts did not agree on the exact cause of Elijah's head injuries. However, the demonstration was consistent with Dr. Perloff's testimony that the cause of Elijah's death was in part a severe impact to his head. The fact that other experts opined that the cause of death was shaken-baby syndrome rather than shaken-impact syndrome goes to

---

[17] WISCONSIN STAT. § 904.03 provides:

> **Exclusion of relevant evidence on grounds of prejudice, confusion, or waste of time.** Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

the weight to be given Dr. Perloff's testimony and his demonstration, and does not make the demonstration irrelevant.

¶ 57. Gribble also challenges the validity of the demonstration, because, he contends, Dr. Perloff could not accurately replicate the force of the impact to Elijah's head. However, we conclude that Dr. Perloff's credentials and the foundation he laid for the demonstration are a sufficient basis for a trial court to reasonably decide that the demonstration was probative of the amount of force that caused Elijah's injuries.

¶ 58. Next, Gribble claims the demonstration was not necessary to assist the jury because Gribble was not contesting the amount of force that caused Elijah's injuries, and the oral testimony of the State's expert witnesses was sufficient to explain to the jury the amount of force. However, the State must prove every element of its case even if the element is not in dispute, and evidence relevant to an element is admissible even if the defendant does not dispute that element. *State v. Hammer*, 2000 WI 92, ¶ 25, 236 Wis. 2d 686, 613 N.W.2d 629. Utter disregard for human life is an element of the crime for which Gribble was convicted. WIS. STAT. § 940.02(1). The trial court decided that the demonstration would assist the jury in understanding whether the person who inflicted the injuries upon the victim had an utter disregard for human life, it explained that decision, and we conclude the decision was reasonable.

¶ 59. Finally, Gribble argues the demonstration was prejudicial because it was performed by a male,

which unfairly suggested that the defendant was the one who committed the act, and because the jury would be horrified by seeing a man smash a representation of an infant's head into a wall.[18] We conclude a reasonable judge could decide that the probative value of the demonstration was not substantially outweighed by its unfair prejudice. Dr. Perloff explained to the jury that the purpose of the demonstration was not a re-enactment and he did not know and could not make any determination about who inflicted the injuries. In addition, the demonstration was brief and was not a significant portion of Dr. Perloff's testimony, which included other forms of demonstrative evidence such as photographs. We see nothing in the record to indicate that the purpose of the demonstration was to inflame the jury or that it likely had that effect, nor do we agree that the demonstration suggested that Gribble was the person who had inflicted the injuries.

*Sentence*

■

¶ 60. Gribble appeals the sentence imposed by the trial court—the maximum sentence of forty years for first-degree reckless homicide[19]—on the ground that the court considered an improper factor. He contends that the court punished him for going to trial and for

---

[18] Gribble also contends the demonstration was unfairly prejudicial because the weight of the doll was less than the actual weight of Elijah and thus unfairly overstated the force. However, he did not make this objection in the trial court and therefore we do not address it. *See Bustamante*, 201 Wis. 2d at 571.

[19] The maximum penalty has since been increased. Wis. Stat. § 939.50(3)(b).

the defense strategy of his attorney, which, Gribble asserts, was beyond his control.

¶ 61. At the sentencing hearing Elijah's grandmother and mother appeared, expressed their deep personal loss, and urged the court to impose the maximum penalty on Gribble. In addition, the State read a letter from Elijah's aunt expressing the same sentiment. The State also spoke in favor of the maximum sentence. Defense counsel argued that the maximum sentence was not appropriate because this was Gribble's first felony conviction and Gribble's background did not support such a sentence.

¶ 62. The trial court explained its reasons for the sentence it imposed. It considered this crime an especially serious and aggravated offense, given that the victim was a helpless infant, was in Gribble's care, the injuries showed a great degree of violence, and the impact on Elijah's family was devastating. The court also considered Gribble's character. It noted mitigating factors, such as Gribble's age and a criminal history that revealed only one prior misdemeanor. It also noted as a significant aggravating factor that Gribble had pursued a defense of putting Rebecca's past life and troubles on trial and asserting that she killed her child. This, in the court's view, victimized Rebecca further. The court recognized that Gribble had a right to plead not guilty and put the State to its burden of proof at trial, and that was certainly not an aggravating factor; however, the court stated, Gribble did not have the right to "manufacture" a defense. The court explained:

> So I am satisfied in my own mind that the line of defense offered by Mr. Gribble was false, and I am not considering that an aggravating factor, just in terms of it having been perjurous per [se], but I am considering it as an aggravating factor in that it subjected Rebecca

453

Foley and her family to essentially being further victimized and further aggravating the nature of the offense which they suffered.

¶ 63. Gribble sought postconviction relief claiming that the trial court improperly held Gribble responsible for defense counsel's trial strategy, which was to suggest that Rebecca caused Elijah's death. Gribble argued that he did not personally accuse Rebecca of causing the fatal injuries and his own testimony was only that she took Elijah back into the apartment. The court denied Gribble's motion. It explained that in its judgment Gribble's testimony that Rebecca went back into the apartment with Elijah was false, and that testimony was the foundation of the defense strategy, because without it there was no evidence Rebecca had access to the child in the relevant time period.

¶ 64. Sentencing is committed to the sound discretion of the trial court, and we review sentencing determinations under the erroneous exercise of discretion standard. *McCleary v. State*, 49 Wis. 2d 263, 278, 182 N.W.2d 512 (1971). A court properly exercises discretion when it considers the facts of record under the proper legal standard and reasons its way to a rational conclusion. *Burkes v. Hales*, 165 Wis. 2d 585, 590–91, 478 N.W.2d 37 (Ct. App. 1991). When reviewing a sentence, we presume the trial court acted reasonably because that court is in the best position to consider the relevant sentencing factors and the demeanor of the defendant; therefore, the defendant has the burden of demonstrating an unreasonable or unjustified basis for the sentence. *State v. Harris*, 119 Wis. 2d 612, 622–23, 350 N.W.2d 633 (1984).

¶ 65. The primary factors the court is to consider in sentencing are: (1) the gravity and nature of the offense; (2) the offender's character and rehabilitative needs; and (3) the public's need for protection. *State v. Sarabia*, 118 Wis. 2d 655, 673, 348 N.W.2d 527 (1984). As part of these primary factors, the court may consider: the vicious or aggravated nature of the crime; any past criminal record or history of undesirable behavior; the defendant's personality, character, and social traits; the presentence investigation; the defendant's demeanor at trial; the defendant's age, educational background, and employment record; and the defendant's remorse, repentance, and cooperativeness. *State v. Borrell*, 167 Wis. 2d 749, 773–74, 482 N.W.2d 883 (1992). The weight to be given each factor is within the discretion of the trial court. *State v. Wickstrom*, 118 Wis. 2d 339, 355, 348 N.W.2d 183 (Ct. App. 1984). If the trial court exercises its discretion based on the appropriate factors, its sentence will not be reversed unless it is "so excessive and unusual and so disproportionate to the offense committed as to shock public sentiment." *Ocanas v. State*, 70 Wis. 2d 179, 185, 233 N.W.2d 457 (1975).

¶ 66. We do not agree with Gribble's claim that the trial court was punishing him for "defense counsel's lawful efforts to support the defendant's claim of innocence." We are satisfied from our review of the record that the court properly considered Gribble's testimony, and considered the defense strategy only insofar as it was based on that testimony, which was within Gribble's control and which the court believed to be false. This is properly within a court's sentencing discretion. When determining a sentence, the sentencing

court has the authority to evaluate a defendant's testimony, determine if it contained "willful and material falsehoods," and assess it in light of all other knowledge gained about the defendant. *United States v. Grayson*, 438 U.S. 41, 55 (1978). We are satisfied from our review of the record that the court did not consider an improper factor and that it otherwise properly exercised its discretion when imposing its sentence on Gribble.

*Restitution*

¶ 67. Gribble appeals from the restitution order of $20,149.02 on the ground that the trial court improperly included in that amount the costs of counseling for Rebecca and her sister, Jenna Foley, Elijah's aunt. He contends that neither Rebecca nor Jenna is a "victim" within the meaning of WIS. STAT. § 973.20(1r), which provides in part:

> When imposing sentence or ordering probation for any crime for which the defendant was convicted, the court, in addition to any other penalty authorized by law, shall order the defendant to make full or partial restitution under this section to any victim of a crime considered at sentencing or, if the victim if deceased, to his or her estate, unless the court finds substantial reason not to do so and states the reason on the record.

The State responds that the trial court correctly decided that Rebecca is entitled to restitution for counseling costs because she is a "victim" as defined in WIS. STAT. ch. 950, which governs "Rights of Victims and Witnesses of Crime." WISCONSIN STAT. § 950.02(4)(a)4.a defines "victim" to include a family member of the person against whom the crime has been committed if

that person is deceased,[20] and a "family member" under § 950.02(3) is a "spouse, child, sibling, parent or legal guardian." Among the basic rights for persons defined as "victims" under § 950.02(4) is the right "[t]o restitution as provided under . . . 973.20." WIS. STAT. § 950.04(1v)(q). As for Jenna's counseling costs, the State contends that even though she is not a "family member" and thus not a "victim" under ch. 950, we should interpret "any victim" in § 973.20(1r) broadly so as to include any person who is psychologically harmed as a result of the crime.

¶ 68. As already stated, our review of questions of statutory interpretation is de novo, and we first inquire whether the statutory language plainly conveys the legislature's intent. *Setagord*, 211 Wis. 2d at 405–06. If the language is not plain, but ambiguous—because it is

---

[20] WISCONSIN STAT. § 950.02(4)(a) provides in full:

(4) (a) "Victim" means any of the following:

1. A person against whom a crime has been committed.

2. If the person specified in subd. 1. is a child, a parent, guardian or legal custodian of the child.

3. If a person specified in subd. 1. is physically or emotionally unable to exercise the rights granted under s. 950.04 or article I, section 9m, of the Wisconsin constitution, a person designated by the person specified in subd. 1 or a family member of the person specified in subd. 1.

4. If a person specified in subd. 1. is deceased, any of the following:

a. A family member of the person who is deceased.

b. A person who resided with the person who is deceased.

5. If a person specified in subd. 1. has been determined to be incompetent under ch. 880, the guardian of the person appointed under ch. 880.

reasonably capable of being interpreted in two or more ways—we may look to the subject matter, object, context, scope, and history of the statute in order to ascertain legislative intent. *Id.* at 406. In doing this, we may look to related statutes, and we are to attempt to harmonize statutes that address the same or similar subject matter. *City of Milwaukee*, 27 Wis. 2d at 56.

¶ 69. Gribble argues that, even though a definition of "victim" is not contained in WIS. STAT. § 973.20, this court decided in *State v. Howard-Hastings*, 218 Wis. 2d 152, 155–56, 579 N.W.2d 290 (Ct. App. 1998), that the meaning of "victim" in this section is plain and is a "person or thing killed, injured, *etc.* as a result of another's deed, or accident, circumstances *etc.*"[21] In *Howard-Hastings*, the issue was whether a government entity was a "victim" under this statute, and, applying this definition, we concluded that the government entity was a "victim." However, depending on the facts of the case, the same statute may be found ambiguous in one setting and unambiguous in another. *Reyes v. Greatway Ins. Co.*, 227 Wis. 2d 357, 365, 597 N.W.2d 687 (1999). Thus, the fact that we have concluded that the meaning of "victim" in § 973.20(1r) is plain when the issue is whether it applies to a government entity directly injured by a crime does not mean that the meaning is plain when the issue is whether the mother of a child killed in the crime, who suffers psychological harm as a result, is a "victim."

---

[21] We arrived at this definition by consulting a dictionary, which we may do to establish the common and ordinary meaning of words. *State v. Howard-Hastings*, 218 Wis. 2d 152, 155–56, 579 N.W.2d 290 (Ct. App. 1998).

458

¶ 70. We conclude that in the context of this case, the meaning of victim is ambiguous. "Victim" could reasonably be interpreted to mean only Elijah, since Gribble was convicted of reckless homicide and only Elijah died as a result of Gribble's conduct.[22] "Victim" could also be reasonably interpreted to mean a person who suffers psychological harm as the result of that death. Finally, because there is a definition of "victim" in Wis. Stat. § 950.02(4)(a), and because that is a related statute, "victim" could reasonably be interpreted according to that definition.

¶ 71. We conclude that "victim" in Wis. Stat. § 973.20(1r) is most reasonably interpreted using the definition in Wis. Stat. § 950.02(4)(a). We reach this result because of the express reference in Wis. Stat. § 950.04(1v)(q) to § 973.20 and the legislative history of Wis. Stat. ch. 950. Prior to 1997, ch. 950 defined a "victim" as "a person against whom a crime has been committed" and restitution was not among the enumerated rights of a victim. The definition of victim was expanded by 1997 Wis. Act. 181, §§ 60–61 to its present definition, and, at the same time, the legislature created § 950.04(1v)(q). 1997 Wis. Act 181, § 65. The legislature's expansion of the definition of victim at the

---

[22] Gribble contends that support for the plain meaning of the term "victim" is found in the sentence in Wis. Stat. § 973.20(1r) that provides that if the victim is deceased, restitution is made to the victim's estate. This wording, Gribble asserts, plainly shows that when someone other than the person injured or killed is allowed to recover, § 973.20 expressly authorizes payment. However, this provision does not resolve the question of who is a "victim": for example, if "victim" were interpreted to include Rebecca, then this provision could be reasonably read to permit her estate to receive the restitution.

459

same time that it added the reference to restitution under § 973.20 is an indication that the legislature intended that everyone included in the expanded definition of victim has the right to restitution under § 973.20.

■

¶ 72. The analysis by the Legislative Reference Bureau in Engrossed 1997 A.B. 342 bears out this intent:

> Among the rights provided to crime victims under current statutes . . . [is] the right to seek restitution from the offender. . . .
>
> This bill does all of the following relating to the rights of victims of crime:
>
> . . . .
>
> [E]xpands the statutory definition of "crime victim" that is used for purposes of providing most rights and services to crime victims. Under the bill, "crime victim" includes, in addition to the person against whom the crime is committed, all of the following persons: a) a parent, guardian or legal custodian of the victim, if the victim is a child; b) a family member of the victim or another person designated by the victim, if the victim is physically or emotionally unable to exercise his or her rights; c) a family member of the victim or a person who resided with the victim, if the victim is deceased; and d) the guardian of the victim, if the victim has been found incompetent and had a guardian appointed for him or her by a court.

Analysis by the Legislative Reference Bureau is indicative of legislative intent. *Appleton Post-Crescent v. Janssen*, 149 Wis. 2d 294, 301, 441 N.W.2d 255 (Ct. App. 1989).

¶ 73. If we were to interpret "victim" in WIS. STAT. § 973.20(1r) in the narrow way that Gribble proposes, we would frustrate the legislature's intent in expanding the definition of victim in WIS. STAT. ch. 950.

¶ 74. Gribble finds support for his proposed definition in one definition of "victim" in WIS. STAT. ch. 949, which governs "Awards for the Victims of Crimes." WISCONSIN STAT. § 949.01(6) defines a "victim" as "a person who is injured or killed by [preventing or attempting to prevent a crime] . . . or by any act or omission of any person that is within the description . . . [of certain listed offenses]."[23] It is just as logical, Gribble asserts, to use this definition as it is to use the one in WIS. STAT. ch. 950. We disagree. First, the definition in § 949.01(6) is not necessarily free from ambiguity, since it still raises the question of whether "injured" includes psychological injury to persons who were close to the person killed by the criminal act. Second, if § 949.01(6) is interpreted to mean only those against whom the crime is committed, that is the narrow definition of "victim" the legislature abandoned in ch. 950 when it added the reference to restitution. Since ch. 949 does not include a specific reference to the victim's right to restitution under WIS. STAT. § 973.20, as does ch. 950, we are persuaded that the definition of "victim" in ch. 950 is the more indicative of legislative intent in § 973.20.

■■■

¶ 75. We therefore conclude that the court did not err when it decided that restitution under WIS. STAT. § 973.20 included the cost of counseling for

---

[23] In another section of WIS. STAT. ch. 949, "victim" has "the meaning specified in s. 950.02(4)." WIS. STAT. § 949.165(1)(b). Gribble offers no rationale for choosing one definition of "victim" in ch. 949 over the other.

Rebecca. As the mother of Elijah she is a "family member" under Wis. Stat. § 950.02(3) and thus is a "victim" under § 950.02(4)(a)4.a. Accordingly, she is a "victim" under § 973.20(1r) and entitled to restitution under § 973.20. Wis. Stat. § 950.04(1v)(q).

¶ 76. Applying that same definition of victim to Jenna, we conclude that, since she is not a "family member" under Wis. Stat. § 950.02(3), she is not a "victim" under Wis. Stat. § 973.20(1r).[24] We reject the State's argument that we should adopt a broader definition of "victim" than that in § 950.02(4)(a). The State does not offer any reasonable way to limit the persons who would be included in a broader category, and, as we have explained above, we are persuaded that the legislature intended that the definition of "victim" in § 950.02 apply to § 973.20(1r).

*By the Court.*—Judgment and order affirmed in part; reversed in part.

---

[24] Jenna is also not a victim under Wis. Stat. § 950.02(4)(a)4.b because she did not reside with Elijah.