COURT OF APPEALS
DECISION
DATED AND FILED

June 22, 2021

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No.     **2020AP265-CR**

STATE OF WISCONSIN

Cir. Ct. No. 2014CF3942

IN COURT OF APPEALS
DISTRICT I

STATE OF WISCONSIN,

     PLAINTIFF-RESPONDENT,

  V.

JUAN RAMONE CAMACHO,

     DEFENDANT-APPELLANT.

     APPEAL from a judgment of the circuit court for Milwaukee County: THOMAS J. McADAMS, Judge. *Affirmed*.

     Before Dugan, Graham and White, JJ.

     **Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1      PER CURIAM.  Juan Ramone Camacho appeals his judgment of conviction for second-degree sexual assault of a child.  He argues that he is entitled to a new trial because the trial court erroneously admitted DNA test results including Camacho as a potential father of the child conceived by his fifteen-year-old niece and a related statistic indicating that it was 700 million times more likely that Camacho, instead of another unrelated male, was the father.  We conclude that the trial court did not erroneously exercise its discretion in admitting this evidence, and we affirm.

## BACKGROUND

¶2      Upon suspicion that she might be pregnant, fifteen-year-old J.A. took a home pregnancy test and, subsequently, went to the hospital for confirmation of the positive result.  J.A. was estimated to be about twenty to twenty-one weeks pregnant.  She underwent an abortion.[1]

¶3      J.A. testified during the trial that she never had sexual intercourse. However, she recalled the Easter weekend in April 2014 she spent at her uncle's[2] house, where she woke up without her clothes on after taking a nap.  J.A. testified that Camacho picked her and her younger brother up and took them to his house for a sleepover.  Camacho was smoking marijuana during the car ride and after prodding and pressuring, Camacho convinced J.A. to smoke.  J.A. had never smoked marijuana before, and she complained of feeling "[l]oopy, dizzy, tired."

---

[1] Following the abortion, a Milwaukee police officer who was at the hospital, conveyed the fetus to the Milwaukee County Medical Examiner's Office to get a tissue sample from the fetus for a DNA test.

[2] J.A.'s mother testified that she and Camacho were full-blooded siblings.

She was watching television at Camacho's house with her younger brother and Camacho's girlfriend's daughter, when Camacho offered to let her take a nap in the other room so she could feel better. J.A. went to sleep in the bedroom fully clothed. When she awoke, her pants were off, her underwear was pulled down, her shirt was pulled up past her belly button, and she had "a lot of discharge" of a "clear fluid" from her vaginal area. She cleaned and dressed herself, but did not say anything until over four months later in August 2014. She feared she was pregnant, but did not want to tell her mother. Instead, she told her brother, and her brother convinced her to tell their mother.

¶4 Camacho was charged with second-degree sexual assault of a child in September 2014 and he was found guilty in May 2016, after a four-day jury trial.[3] The trial court subsequently sentenced Camacho to thirty years imprisonment composed of twenty-two years and six months of initial confinement, and seven years and six months of extended supervision.

¶5 During the trial, in addition to hearing testimony from J.A., J.A.'s mother, and two of the officers involved in the case, the jury also heard testimony from a DNA analyst from the Wisconsin State Crime Laboratory about testing performed using the fetal tissue and DNA samples from J.A., Camacho, and J.A.'s brother.[4] In her testimony, the analyst described the method she used to compare the fetal tissue to the samples provided and explained that she looks for matching

---

[3] The Honorable Stephanie Rothstein presided over the proceedings in Camacho's case until August 2015, at which time the Honorable Thomas J. McAdams took over the proceedings as a result of a reassignment of the court's calendar.

[4] A sample was taken from J.A.'s brother and tested at Camacho's request. J.A. never accused her brother of sexually assaulting her.

DNA at fifteen different points. She testified that the DNA from the fetal tissue and the DNA from Camacho's sample matched at all fifteen points, but the fetal sample did not match at all fifteen points when compared with J.A.'s brother's sample. Thus, the DNA analyst testified, "Camacho could be included as a possible father to the fetal tissue" and that "assuming that [J.A.] is the mother of the fetal tissue, it is 700 million times more likely that [] Camacho is the father of the fetal tissue than an unrelated, unknown individual."[5] The analyst addressed the statement in the report that the statistical calculation was based on the assumption that Camacho and J.A. were unrelated. She stated that a statistic that accounted for the fact that Camacho and J.A. were related would "more accurately assesses the likelihood of parentage." However, she testified that her statistic remained the same even in light of the familial relationship between Camacho and J.A., and nothing would change the fact that the fetal tissue and Camacho's sample matched on all fifteen points.

¶6 On cross-examination, Camacho extensively questioned the analyst about the procedures she used to conduct the testing and, in particular, the impact

---

[5] The DNA analyst issued two reports in this matter with these conclusions. Her first report, dated September 9, 2014, stated that Camacho "is a possible biological father of the fetal tissue" and "it is at least 700 million times more likely" that Camacho "is his biological father than if a random, unrelated male is the father." The second report, dated August 26, 2015, included the same information but added an additional paragraph towards the end of the report that stated:

> It should be noted that this statistical analysis is based on the assumption that the mother and alleged father are unrelated. For a statistical analysis which more accurately assesses the likelihood of parentage for a situation in which the mother and alleged father are related, the submitter is advised to seek consultation from a parentage testing laboratory.

Both of these reports were admitted into evidence at trial, and the paragraph added to the second report provides the basis for Camacho's argument on appeal.

that the assumption had on her statistical calculation and her recommendation that the State consult a parentage testing lab because of the familial relationship between Camacho and J.A.[6] Camacho asked if the analyst recommended that a parentage testing lab be consulted "[b]ecause it will establish for real who the father is." She again testified, "No, this would not say -- This would not change the fact that [] Camacho types, all match of up with what the father's type would have to be. It would merely change possibly, the statistic." The analyst was further questioned on this topic by the State during redirect:

> [State:] Would that change your findings in any regards about him being more likely the father, in one in 700 million or the African American database, the 1 in 900 million for the Caucasian database, the 1 in 9 billion in the Hispanic southeast database, or the 7.9 billion Hispanic southwest database?
>
> [Analyst:] It would not, as I have no other way of calculating a statistic in this case.

¶7    When later asked whether the statistics "prove" that Camacho was the father, she again testified, "All I can say is the types that were required of the father were present in [] Camacho's profile. He is a possible father of the fetus. That is all I can say."

¶8    Prior to the trial, Camacho, proceeding *pro se*, filed several motions related to the DNA testing and seeking to exclude the DNA testing evidence and the analyst's testimony for various reasons. As pertinent here, in his first motion *in limine*, Camacho sought to exclude the DNA test results and, as one of those

---

[6] Camacho was represented by three separate attorneys appointed by the State Public Defender's Office before he filed a motion seeking to proceed *pro se* on March 2, 2015. The trial court granted his motion at a hearing on that date and appointed standby counsel to assist Camacho.

reasons, argued that the results should be excluded "because of 'exaggerated statistical calculations [and] interpretations.'" Camacho reasoned that the test results should be excluded based on the analyst's comparison to databases for Caucasian, African-American, and other races when Camacho is of Puerto-Rican descent. Shortly before trial, Camacho filed an "Addendum to Motion in Limine," wherein Camacho again sought to exclude the DNA test results, but this time he included as one of the grounds the fact that the statistical analysis was based on the inaccurate assumption that he was not related to J.A., and the statistic itself was "only meant and relevant" for unrelated individuals. Both these motions *in limine* were denied and, as with many of the other challenges Camacho raised to the DNA test results, were thought to be the proper subject of cross-examination.

¶9    Camacho now appeals and argues that the trial court erroneously exercised its discretion when it denied his requests to exclude the DNA testing evidence. More specifically, Camacho argues that the statistic contained in the analyst's reports and testified to during trial was irrelevant because it was based on the inaccurate assumption that Camacho and J.A. are unrelated. He further argues that, if this evidence is relevant, it was unfairly prejudicial and misled the jury and, therefore, should have been excluded.[7]

## DISCUSSION

¶10    "The question of whether to admit evidence is within the circuit court's discretion." *State v. Warbelton*, 2009 WI 6, ¶17, 315 Wis. 2d 253, 759

---

[7] The State additionally argues that any error in the admission of the DNA testing evidence is harmless. Because we conclude that the evidence was properly admitted, we do not address the State's argument regarding harmless error.

N.W.2d 557. We will reverse a circuit court's decision "only if the circuit court erroneously exercised its discretion." *Id.* "A circuit court erroneously exercises its discretion when it bases its decision on a misstated fact or an incorrect view of the law." *Id.*

¶11 As a preliminary matter, the State argues that Camacho waived his right to challenge the admission of the DNA testing evidence because, after being advised by the trial court and standby counsel about the potential need for a *Daubert* hearing,[8] Camacho specifically and repeatedly stated that he was not asking for a *Daubert* hearing to challenge the science behind the results.[9] In response, Camacho argues that he was not required to challenge the DNA testing evidence under *Daubert* and his repeated attempts to exclude the results before trial were sufficient to apprise the State and the trial court of his objection.

¶12 We agree with Camacho that he has not waived his right to challenge the DNA testing evidence. Camacho filed two motions *in limine* that specifically raised objections to the statistical calculation, and the DNA test results generally were the subject of much debate during the pre-trial proceedings. These were sufficient to put the court and opposing counsel on notice of Camacho's objection. *See **State v. Corey J.G.***, 215 Wis. 2d 395, 405, 572 N.W.2d 845 (1998) ("An objection or motion is sufficient to preserve an issue for appeal if it apprises the court of the specific grounds upon which it is based."). Moreover, a *Daubert* hearing was not required to preserve the challenge Camacho raised to the DNA

---

[8] ***Daubert v. Merrell Dow Pharms., Inc.***, 509 U.S. 579 (1993).

[9] The analyst's second report containing the additional paragraph had not been issued at the time Camacho filed his first motion *in limine*.

testing evidence being based on an inaccurate underlying assumption. *See State v. Giese*, 2014 WI App 92, ¶23, 356 Wis. 2d 796, 854 N.W.2d 687 ("The accuracy of the facts upon which the expert relies and the ultimate determinations of credibility and accuracy are for the jury, not the court."). Therefore, we turn to the merits of Camacho's arguments.

¶13    Camacho first argues that the DNA test results in this case were improperly admitted because the results lack probative value and, therefore, are not relevant evidence. He argues that "[a]lthough the results purportedly relate to a fact of consequence—whether Camacho had sex with J.A.—they do not help answer that question."

¶14    Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." WIS. STAT. § 904.01 (2019-20).[10]  To determine whether evidence has probative value, we ask "whether the consequential fact or proposition for which the evidence was offered becomes more or less probable than it would be without the evidence." *State v. Payano*, 2009 WI 86, ¶70, 320 Wis. 2d 348, 768 N.W.2d 832. Probative value "is a common sense determination based less on legal precedent than life experiences." *Id.* (citation omitted).

¶15    In this case, common sense dictates that the DNA test results certainly make the fact of consequence here more or less probable than it would be without the evidence. The analyst testified that Camacho's DNA matched with

---

[10] All references to the Wisconsin Statutes are to the 2019-20 version unless otherwise noted.

the DNA from the fetal tissue on all fifteen points tested and, therefore, Camacho was included as a possible father of the fetus. She then testified to a statistic that Camacho was "700 million times more likely" to be the father based on those results. She further testified that any inaccuracy in the statistic being based on the assumption that Camacho and J.A. are unrelated does not change the matching points of DNA found between Camacho and the fetal tissue, and does not even change her statistic. As she explained, accounting for the fact that Camacho and J.A. are related would produce a more accurate statistic, but the fact remained that Camacho was a potential father.

¶16 Consequently, the DNA test results help determine whether Camacho is the father of the fetus and, in turn, are probative of the fact of consequence, namely whether Camacho had sex with J.A. *See State v. Hartman*, 145 Wis. 2d 1, 14-16, 426 N.W.2d 320 (1988) ("Evidence which informs the jury of the probability that the defendant is the father of a child who was alleged to have been conceived as a result of a sexual assault perpetrated by the defendant is clearly relevant to the determination of whether the defendant sexually assaulted the mother of the child."). Even considering the limits of the statistic, the statistic itself is also still probative of the fact of consequence, even if it is less so. Thus, we discern no erroneous exercise of discretion on the trial court's part in admitting the evidence because the DNA test result comparing Camacho and the fetus and

9

the resulting statistic had probative value in determining whether Camacho had sexual intercourse with his niece.[11]

¶17     Camacho next argues that relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." *See* WIS. STAT. § 904.03.   He further argues that the DNA test results are inadmissible because the risk of unfair prejudice and misleading the jury substantially outweigh what little probative value the test results have.   Camacho argues that, assuming the test results have any probative value, the "jurors were presented with a calculation that made it appear highly likely" that Camacho was the father, without any ability "to assess the extent to which the familial relation undermined that calculation."   Then, given that J.A. was sleeping during the alleged assault, the DNA test results played "the central role" in the State's case.

¶18     Contrary to Camacho's contention, the jury was presented with an ability to assess the DNA evidence and was not misled in a way that constituted unfair prejudice, and did not substantially outweigh the probative value of the DNA testing evidence.   The DNA analyst testified regarding the testing process— she described the number of points she looks for in comparing DNA samples, she described that Camacho's sample matched on all points when compared with the

---

[11] Camacho further argues that we should reverse the trial court's decision to admit the DNA testing evidence because the trial court utterly failed to exercise discretion at the time it denied Camacho's motion *in limine*.  We recognize that, at the time it denied Camacho's motion *in limine* on this specific topic, the trial court said nothing more than, "Okay.  That one's going to be denied as well.  All right.  Let's move on to 4."  However, we also recognize that this denial followed several motions, hearings, and lengthy discussions on the topic of the DNA testing evidence.  Thus, we find sufficient evidence of the trial court's discretion in the record.

fetal tissue, and she described that J.A.'s brother did not match. She thus explained to the jury that Camacho could be included as a possible father and J.A.'s brother was excluded based on the matching points. She also further testified to the statistic and the limits of that statistic.

¶19 Moreover, Camacho extensively cross-examined the analyst not only on the underlying assumption that Camacho and J.A. are unrelated, but also on several points where the analyst's testing deviated from protocols and procedures. Accordingly, the jury had the tools necessary to assess the analyst's testimony and was not misled by the statistic when it is placed within the overall context of the trial. Additionally, given the probative value of the evidence and the low risk of misleading the jury, the probative value was not substantially outweighed such that the DNA testing evidence should have been excluded.

¶20 Camacho additionally argues that the statistic was unfairly prejudicial because of the emphasis the State placed on the statistic during the closing argument. During closing arguments, the prosecutor led with the statistic provided by the analyst, but he spent the majority of his closing argument focused on J.A.'s testimony. After leading with the statistic, he then said, "I don't want you to get lost in the stats in this case because we spent all day yesterday on DNA and the statistics and things like that." He then spent a significant amount of time discussing J.A.'s account. Given the context in which the statistic was used and the amount of time the prosecutor spent on J.A.'s account, any risk of unfair prejudice is again outweighed by the probative value of the DNA testing evidence.

¶21 In further arguing for exclusion, Camacho relies on *State v. Denton*, 2009 WI App 78, 319 Wis. 2d 718, 768 N.W.2d 250, and argues that the State

impermissibly "sift[ed] and winnow[ed]" the evidence in his case just as the State did in *Denton*. We do not agree.

¶22 In *Denton*, we first recognized that the defendants had no notice of the computer-generated animation that the State sought to introduce. *Id.*, ¶12. We then stated that "the surprise in this case was coupled with the danger of prejudice and confusion." *Id.* There is no element of surprise here. Given the extent of the pre-trial proceedings focused on the DNA testing, Camacho was clearly aware of the results. Moreover, the prejudice and confusion in *Denton* was premised on the fact that the State failed to lay any foundation for the animation, and failed to explain to the jury how to use the animation evidence. *Id.*, ¶¶21-22. Instead, the State introduced the animation to the jury as if it was an eyewitness account as opposed to what it actually was, namely, "a collage of information" based on all the witness accounts. *Id.*, ¶22. The record here clearly reveals that is not what happened in Camacho's case. Rather, the analyst was clear about the limits of her statistic, and both the State and Camacho questioned her on the accuracy of the statistic, among many other things. *Denton* is, therefore, not instructive regarding whether the DNA testing evidence should have been excluded here.

## CONCLUSION

¶23 In sum, we conclude that the DNA testing evidence was properly admitted. The evidence was relevant and its probative value was not substantially outweighed by any unfair prejudice or misleading of the jury. Accordingly, we affirm the judgment.

*By the Court.*—Judgment affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.